**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 11-5148**

---

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

        v.

FOSTER GAY WILLIAMS, III,

              Defendant - Appellant.

---

Appeal from the United States District Court for the Northern District of West Virginia, at Elkins.  John Preston Bailey, Chief District Judge.  (2:11-cr-00012-JPB-JSK-1)

---

Argued:  October 25, 2012            Decided:  March 25, 2013

---

Before NIEMEYER, GREGORY, and THACKER, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.  Judge Gregory wrote a separate opinion concurring in the judgment.

---

**ARGUED:** Brian Joseph Kornbrath, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Clarksburg, West Virginia, for Appellant.  Stephen Donald Warner, OFFICE OF THE UNITED STATES ATTORNEY, Elkins, West Virginia, for Appellee.  **ON BRIEF:** William J. Ihlenfeld, II, United States Attorney, Wheeling, West Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant Foster Gay Williams III ("Appellant Williams") pleaded guilty to conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. At sentencing, the district court applied a three-level enhancement pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(b)(13)(C)(ii) (2010). This enhancement applies when an offense involves the manufacture of methamphetamine and creates a substantial risk of harm to human life. Appellant Williams challenges the application of this enhancement on the ground that he did not endanger anyone other than himself while manufacturing methamphetamine, and, therefore, the enhancement should not apply in as much as to apply the enhancement in such a circumstance would, in essence, make the enhancement applicable in all methamphetamine manufacturing cases, thereby defeating the purpose of an "enhancement." Because we conclude that Appellant Williams' actions did, in fact, pose a substantial risk of harm to the lives of others, and not simply his own, we affirm.

I.

A.

Appellant Williams manufactured methamphetamine using what is known as the "shake and bake" method. This increasingly

2

popular method of methamphetamine manufacture involves mixing an assortment of common household chemicals—including Coleman fuel, drain opener, ammonium nitrate (found in cold pack compresses), lithium (found in batteries), and pseudoephedrine (found in over-the-counter cold medication)—in a medium-sized plastic bottle causing a series of chemical reactions to take place. Once those reactions have taken place, the manufacturer creates a gaseous mixture in a second bottle using either sulfuric or muriatic acid. The second bottle has a hose attached to it, which the manufacturer uses to spray the gas onto the liquid which is contained in the first bottle. This process, known as "smoking," causes solid methamphetamine to precipitate. Once the resulting solid is filtered, the process is complete. Ultimately, this process takes roughly two hours and yields approximately one and a half grams of methamphetamine.

Though simple, this method of methamphetamine manufacture is very dangerous.[1] The Presentence Report ("PSR") notes that the mixture described above is "bomb-like" and "capable of exploding or 'blowing a hole' wherein the mixture of

---

[1] Indeed, Appellant Williams conceded as much at sentencing: "THE COURT: You concede the manufacture of meth is in fact dangerous? Mr. Kornbrath: I have to. I mean there's chemicals involved and it's a process that could go wrong." J.A. 36.

Citations to the "J.A." refer to the Joint Appendix filed by the parties in this case.

chemicals and fire shoots out creating a flash fire." J.A. 94. Moreover, the shake and bake method "does not produce the signature 'chemical smell' of a traditional methamphetamine lab, therefore, persons within a close proximity have no warning that they are in danger." Id.

The district court concluded that Appellant Williams manufactured methamphetamine using this method at two separate locations: (1) his home—a trailer in Junior, West Virginia; and (2) the Econo Lodge motel in Elkins, West Virginia.

1.

In late 2010, police in Junior, West Virginia, learned from an informant that Appellant Williams was involved in the manufacture of methamphetamine. On January 28, 2011, police conducted surveillance on Appellant Williams' single-wide trailer. The trailer was in a remote area, 75-100 yards from the nearest occupied residence. Police observed blankets covering the windows of the trailer and smelled a strong chemical odor coming from within.

On February 2, 2011, police executed a search warrant at the trailer and found items typically used to manufacture and ingest methamphetamine. Specifically, the items located at the trailer were: a syringe on the coffee table, a box with four additional syringes, burned foil, a smoking pipe made out of a light bulb, three syringes on the bedroom dresser, various

4

syringes in the bathroom, a jar with a hose taped to the lid, a can of Coleman fuel, a bottle of muriatic acid, batteries cut in two, and rubber gloves. Outside the trailer, police found a burn pile, an empty can of Coleman fuel, and rubber gloves. Several items found inside the trailer—including the light bulb, the spoon, and the straw—tested positive for methamphetamine and pseudoephedrine.

2.

On February 8, 2011, members of the West Virginia State Police learned from an informant that Appellant Williams was staying in Room 131 of the Econo Lodge motel in Elkins, West Virginia. The informant also indicated that there was an active warrant for Appellant Williams' arrest. Later that day, three state police officers traveled to the motel. When they arrived, they confirmed that Appellant Williams was indeed staying at the Econo Lodge, that he had been there for four days, and that he was scheduled to check out later that day. The officers also obtained a key to Appellant Williams' room from the hotel clerk.

The officers then went to Appellant Williams' room, knocked on the door, and announced their presence. When no one answered, they entered the room, only to find it unoccupied. While in the motel room, one of the officers observed a backpack in plain view. The officers also observed that the backpack was

5

partially open and that it contained a bottle connected to a hose.

Police then exited the room and hid nearby, waiting for Appellant Williams to return. When he did, he walked up to the door and attempted to open it. Finding it locked, he started walking toward the lobby. The officers interceded and placed him under arrest. Following the arrest, the officers asked Appellant Williams what was inside the room. Appellant Williams stated that the motel room contained a backpack containing items to manufacture methamphetamine. Despite this admission, Appellant Williams denied ownership of the materials, claiming they belonged to his girlfriend. Appellant Williams was then taken into custody.

Thereafter, a certified lab technician arrived on the scene. By that time, Appellant Williams had already been taken to magistrate court, where he signed a written consent form authorizing a search of the motel room. Pursuant to that authorization, the technician proceeded to search the room.

During the search, the technician found all of the materials necessary to manufacture methamphetamine. Specifically, inside the backpack, the technician found: a hose connected to a plastic bottle, a gallon of Coleman fuel, a quart of hydrochloric acid, a lithium battery, drain opener, bottles, hoses, and a Gatorade bottle that contained a white paste-like

6

substance.  Lab reports later concluded that the white paste in the Gatorade bottle was dissolved pseudoephedrine.[2]  In addition to the items found in the backpack, the technician found a one pint bottle of clear liquid, a receipt for the purchase of Coleman fuel, a box of sleeping pills, and instant ice compressors. He also found three syringes and a spoon inside the night stand.  And, on February 8, Appellant Williams' girlfriend posted a picture to her Facebook account of her in the Econo Lodge captioned "up partying all night long."  J.A. 110.

### 3.

In addition to the evidence found at the trailer and the motel, the district court found that Appellant Williams repeatedly purchased ingredients used to manufacture methamphetamine.  Specifically, Appellant Williams purchased Coleman fuel and muriatic acid numerous times between December 26, 2010 and February 18, 2011.  Appellant Williams also bought pseudoephedrine on eleven occasions between December 10, 2010 and January 26, 2011.

### B.

On April 19, 2011, a grand jury sitting in the Northern District of West Virginia at Elkins returned an 18-

---

[2] Pseudoephedrine is the active ingredient in over-the-counter cold medication.  As noted, it is also one of the main ingredients in the manufacture of methamphetamine.

count indictment charging Appellant Williams with conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 846, § 841(a)(1), and § 841(b)(1)(C); sixteen counts of possession of materials to be used to manufacture methamphetamine in violation of 21 U.S.C. § 843(a)(6) and § 843(d)(2); and one count of maintaining a drug involved premises in violation of 21 U.S.C. § 856(a)(2). On June 3, 2011, Appellant Williams pleaded guilty to a single count of conspiracy to manufacture methamphetamine.

In the PSR, the probation officer recommended a base offense level of 28[3] with a three level decrease for acceptance of responsibility and a three level enhancement pursuant to U.S.S.G. § 2D1.1(b)(13)(C)(ii) for creating a substantial risk of harm to human life. Importantly, in deciding to apply this enhancement, the probation officer concluded that Appellant Williams had manufactured methamphetamine at both the Econo Lodge and the trailer. See J.A. 94 ("[T]he defendant and others manufactured methamphetamine in a trailer located on his parents' property and also at the Econolodge hotel located in Elkins, West Virginia."). This calculation resulted in a total recommended offense level of 28.

---

[3] In so doing, the probation officer declined to accept the parties stipulated base offense level of 26. However, as discussed below, the district court ultimately utilized the parties proposed offense level of 26.

8

At sentencing, Appellant Williams raised two objections to the PSR. First, he objected to the PSR's use of the base level of 28. This objection was largely based on the fact that the parties had previously stipulated to a base offense level of 26.[4] The district court sustained this objection and calculated Appellant Williams' sentence using a base offense level of 26.

Second, Appellant Williams argued the evidence was insufficient to justify the application of the enhancement with respect to the manufacture of methamphetamine at either the trailer or the motel. As to the trailer, Appellant Williams argued that the PSR mistakenly claimed that his trailer was located immediately behind his family's house. Instead, Appellant Williams argued that the trailer was in a remote location, 75 to 100 yards away from the nearest occupied residence at the time.[5] The Government conceded this point.

---

[4] The discrepancy between the stipulated base offense level and the recommended base offense level in the PSR reflects the fact that the parties agreed that some of the pseudoephedrine was purchased for legal purposes while the probation officer treated all of Appellant Williams' pseudoephedrine purchases as illegal.

[5] There is a residence located approximately thirty yards away from Appellant Williams' trailer. However, it is only occupied during the summer months and, therefore, was unoccupied when the police uncovered evidence of methamphetamine manufacturing.

Based on this concession, Appellant Williams argued that the trailer was too remote for any methamphetamine manufacturing conducted there to pose a risk to anyone other than himself. As to the motel, Appellant Williams argued there was no factual support for the claim that he manufactured methamphetamine there. Instead, he asserted that the motel was simply used for storage of the materials.

The district court overruled this objection and applied the enhancement. In so doing, the district court noted, "the presentence report is accepted and ordered filed and made a part of the record herein." J.A. 43. Accordingly, the district court found that Appellant Williams' total offense level was 26, resulting in a recommended sentence of 120 – 150 months imprisonment. The district court then sentenced Appellant Williams to 120 months imprisonment. This appeal followed.

II.

A district court determines whether a sentencing enhancement applies "based on a preponderance of the evidence standard." United States v. Blauvelt, 638 F.3d 281, 293 (4th Cir. 2011). When reviewing a district court's application of an enhancement, we review conclusions of law de novo and findings of fact for clear error. United States v. Houchins, 364 F.3d 182, 187 (4th Cir. 2004), vacated on other grounds, 543 U.S. 1104 (2005). "Whether a district court has properly found the

10

existence of a substantial risk of harm to human life or the environment within the meaning of Guidelines § 2D1.1(b)(5)(B) is a mixed question of law and fact which we review de novo." Id. (internal citations and quotation marks omitted).

III.

1.

The 2010 Sentencing Guidelines Manual, which was in effect at the time of Appellant Williams' sentencing, provides:

> If the offense involved the manufacture of amphetamine or methamphetamine and the offense created a substantial risk of harm to (I) human life . . . ; or (II) the environment, increase by 3 levels. If the resulting offense level is less than level 27, increase to level 27.

U.S.S.G. § 2D1.1(b)(13)(C)(ii). The relevant application note provides as follows:

> 20. Substantial Risk of Harm Associated with the Manufacture of Amphetamine and Methamphetamine.
>
> (A) Factors to Consider. In determining, for purposes of subsection (b)(13)(C)(ii) . . . , whether the offense created a substantial risk of harm to human life or the environment, the court shall include consideration of the following factors:
> (i) The quantity of any chemicals or hazardous toxic substances found at the laboratory, and the manner in which the substances were stored.
> (ii) The manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment of hazardous or toxic substances.
> (iii) The duration of the offense, and the extent of the manufacturing operation.
> (iv) The location of the laboratory (e.g., whether the laboratory is located in a residential

11

neighborhood or a remote area), and the number of human lives placed at substantial risk of harm.

U.S.S.G. § 2D1.1(b)(13)(C)(ii) cmt. n. 20. While a district court must consider all four factors, it need not find that all are met in order to apply the enhancement. See Houchins, 364 F.3d at 188 n.9.

Applying these factors in this case, the district court found:

I am going to find that the enhancement does apply by a preponderance of the evidence. There's no question we had cooking, as that term is loosely used, the preparation of meth at the trailer, which was somewhat secluded but as I read the application notes, the cooking doesn't have to take place for there to be the enhancement. The application note instructs the Court to look at the chemicals that were present, the manner in which they were stored, also to look at the duration of the offense and apparently based on the—at least the part at the trailer, it was going on for some period of time. The location of the laboratory; certainly one was in a remote area; the other was in a position, not laboratory, but where the—place where the chemicals were stored was in a location, being the motel room, which placed a number of human lives at a substantial risk of harm.

J.A. 43.

Further, at sentencing, the court engaged in the following discussion with Appellant Williams' counsel:

THE COURT: I understand your objection but the guideline actually reads: "Created a substantial risk of harm to human life." It doesn't say others and/or the environment.

Appellant Counsel: Right. Human Life. We have a meth addict who's making meth.

12

THE COURT: He's human.

J.A. 37. Thus, per the reasoning of the district court, because Appellant Williams is "human" and because he endangered his own life by manufacturing methamphetamine, the enhancement should apply.

2.

On appeal, Appellant Williams argues that there is insufficient evidence to support the application of the enhancement either as to the trailer or the Econo Lodge. With regard to the trailer, he asserts that, given its remote location, he was the only "human life" endangered and that the district court thus erred in finding that danger to the manufacturer is sufficient to justify the application of the enhancement. With regard to the Econo Lodge, Appellant Williams contends that he never manufactured methamphetamine there and that, instead, he merely used the motel room for storage. Accordingly, he asserts the enhancement cannot apply.

We agree with Appellant Williams that the district court erred in finding that the enhancement applies simply because Appellant Williams endangered his own life. To broadly construe the phrase "human life" to include situations where the defendant is the only person endangered would impermissibly turn the enhancement into a de facto minimum sentence in all methamphetamine manufacturing cases, as every person who

13

manufactures methamphetamine places themselves at a substantial risk of harm. See United States v. Staten, 466 F.3d 708, 716 (9th Cir. 2006). This would violate the spirit of the enhancement, which is to be applied only in extraordinary factual circumstances. See United States v. Pinnow, 469 F.3d 1153, 1156-57 (8th Cir. 2006) ("[A] district court 'may not rest application of the enhancement on facts that are necessarily common to most or every manufacture' because analysis of the mandatory factors in Application Note 20(a) 'demands an inquiry into the details of a particular case.'")(quoting Staten, 466 F.3d at 716).

However, because we find the evidence at the motel sufficient to justify the application of the enhancement, we affirm on that basis.

An evaluation of the four factors relevant to the U.S.S.G. § 2D1.1.(b)(13)(C)(ii) enhancement demonstrates that Appellant Williams' methamphetamine manufacturing activities at the Econo Lodge posed a substantial risk of harm to human life.

a. *Quantity of Chemicals or Hazardous or Toxic Substances and Manner of Storage*

Appellant Williams contends this factor weighs against application because all of the chemicals found at the motel could fit inside a backpack. However, this does not necessarily weigh against application of the enhancement. First, because

14

the entire shake and bake process of manufacturing methamphetamine takes place inside a medium-sized soda bottle, this method does not require a manufacturer to possess a large volume of materials. Nevertheless, this method of manufacture is highly dangerous.

Additionally, many of the substances found in the motel create serious hazards if not carefully stored. See United States v. Whited, 473 F.3d 296, 299 (6th Cir. 2007) ("[M]any of the chemicals involved in the production of methamphetamine are toxic, inherently dangerous, highly flammable, and pose a serious risk to those who inhale them.") (citations and internal quotation marks omitted); United States v. Chamness, 435 F.3d 724, 727 (7th Cir. 2006) ("Coleman fuel is flammable and can be explosive. Muriatic acid is toxic and can cause severe burns. The acid and salt are combined to create hydrochloric acid, and the evidence before the district court indicated such an acid is a strong irritant of the eyes, mucous membranes, and skin.") (internal citations omitted); United States v. Layne, 324 F.3d 464, 470 (6th Cir. 2003) ("Acetone, Coleman fuel, and red phosphorus are flammable and can be explosive. Muriatic gas is a toxin that can cause severe burns."); United States v. Dick, 173 F. Supp. 2d 765, 767 (E.D. Tenn. 2001) ("Campstove fuel is both flammable and explosive.").

Moreover, as the probation officer noted in the PSR, Appellant Williams stored these dangerous materials "in an uncontrolled manner and in and/or around areas accessible to other unsuspecting individuals." J.A. 93. Thus, this factor weighs in favor of applying the enhancement.

b. *Manner of Disposal and Likelihood of Release Into Environment*

There was no evidence as to the manner of disposal of the materials at the motel. Thus, this factor is indeterminate.

c. *Duration of the Offense and Extent of the Manufacturing Operation*

Appellant Williams contends this factor weighs against applying the enhancement because manufacturing did not take place at the motel. He further contends that the district court did not make a finding to the contrary. Rather, he asserts the district court found that the motel was only used for storage.

While the district court did not expressly indicate at sentencing that Appellant Williams manufactured methamphetamine at both the motel and the trailer, the PSR did. J.A. 94 ("As previously noted, the defendant and others manufactured methamphetamine in a trailer located on his parents' property and also at the Econolodge hotel in Elkins, West Virginia."). As noted, the district court accepted the PSR and made it a part

16

of the record in this case.[6]  Because Appellant Williams failed

to demonstrate otherwise, we may treat the finding in the PSR as

a finding of fact by the district court.  See United States v.

Randall, 171 F.3d 195, 210-11 (4th Cir. 1999) ("If the district

court relies on information in the presentence report (PSR) in

making findings, the defendant bears the burden of establishing

that the information relied on by the district court in making

its findings is incorrect; mere objections are insufficient.").

Here, there is ample evidence to support this finding.

As noted, law enforcement found all of the materials necessary

to manufacture methamphetamine using the shake and bake method

(i.e.  hoses,  glass  and  plastic  bottles,  Coleman  Fuel,

hydrochloric  acid,  a  lithium  battery,  drain  opener,  and

dissolved pseudoephedrine) in Appellant Williams' motel room.

---

[6] Specifically, at the sentencing hearing, the district court adopted the findings of the PSR in open court. Additionally, in its Statement of Reasons, the district court similarly indicated that it was adopting the PSR. Finally, at sentencing, the district court overruled Appellant Williams' objection to the application of the enhancement, which was based on Appellant Williams contention that manufacturing did not take place at the motel. Thus, the district court properly adopted the factual findings of the PSR. See United States v. Walker, 29 F.3d 908, 912 (4th Cir. 1994) ("It is self-evident that, in expressly overruling Walker's objections to the PSR, the court was in fact adopting the controverted PSR findings.")

Notably, the only two other areas of disagreement with the PSR (i.e. the PSR's use of a base offense level of 28 and the PSR's findings as to the location of the trailer) were either stipulated or conceded by the parties.

Additionally, police uncovered three syringes and a spoon in the motel room and Appellant Williams' girlfriend posted a picture to Facebook with the caption "up partying all night long." The Facebook post is particularly relevant here, because Appellant Williams pled guilty to conspiracy and because Appellant Williams admitted to police officers that the backpack in the motel room contained items to manufacture methamphetamine and that his girlfriend was staying in the motel room with him. Moreover, several of the items found in the motel room contained pseudoephedrine residue, evincing their use in the manufacture of methamphetamine. This evidence is more than sufficient to sustain a finding that Appellant Williams manufactured methamphetamine at the motel. Therefore, this factor weighs in favor of applying the enhancement.

*d. Location of the Laboratory and Number of Human Lives Placed at Substantial Risk of Harm*

By manufacturing methamphetamine at a motel, Appellant Williams placed a number of human lives at risk. Appellant Williams concedes as much. <u>See</u> J.A. at 41-42 (Appellant Counsel: "I concede, if there was meth manufactured in a hotel room [the enhancement] applies because there's people right next door[.]") Thus, this factor weighs strongly in favor of applying the enhancement.

18

Moreover, even if we were to agree with Appellant Williams and conclude that the district court did not make a factual finding that manufacturing took place at the motel, we would nonetheless affirm the judgment of the district court solely based on the fact that Appellant Williams stored hazardous chemicals in the motel room. Here, Appellant Williams had all of the materials necessary to manufacture methamphetamine in his motel room, including Coleman fuel and sulfuric acid. As noted, both items can be hazardous if handled improperly. Despite this, Appellant Williams brought these items into a motel room that was occupied by an untold number of unsuspecting people. This fact alone supports the conclusion that Appellant Williams' actions created a substantial risk of harm to human life.

In reaching this conclusion, we reject Appellant Williams' contention that the existence of a laboratory at the motel is a necessary pre-requisite to the operation of the enhancement. The only pre-requisites listed in the text of U.S.S.G. § 2D1.b(13)(C)(ii) are (i) the offense must involve the manufacture of methamphetamine and (ii) the offense must pose a substantial risk of harm to human life or the environment. The guideline contains no indication that it must be the manufacture of methamphetamine itself that causes a substantial risk of harm to human life, leaving open the possibility that storage of

19

hazardous chemicals in a dangerous manner could justify the application of the enhancement.

Moreover, while the fourth factor references "the location of the laboratory," it also commands a court to consider "the number of human lives placed at a substantial risk of harm" without any requirement that the risk of harm be posed by the manufacturing of methamphetamine. Thus, we agree with the district court insofar as the court concluded that a finding that methamphetamine was manufactured at the motel was unnecessary to the application of the enhancement. See J.A. 43 ("[A]s I read the application notes, the cooking doesn't have to take place for there to be the enhancement.").

IV.

Thus, based on the relevant factors to be considered in applying the U.S.S.G. § 2D1.1(b)(13)(C)(ii) sentencing enhancement, we conclude that the evidence at the motel supports the district court's conclusion that Appellant Williams' methamphetamine manufacturing activities posed a substantial risk of harm to human life. Accordingly, the enhancement was properly applied.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

20

GREGORY, Circuit Judge, concurring:

I concur in the judgment, but write separately to emphasize that, in my view, the enhancement properly applies based on the only reason clearly provided by the district court: that Williams placed a number of human lives at a substantial risk of harm by bringing dangerous chemicals into a public motel room and storing them there. As the majority notes, these chemicals are hazardous if not stored properly, and yet, Williams chose to bring them into the motel room, placing them within reach of at least one other drug user, and exposing an untold number of other motel guests and employees to a substantial risk of harm.

The majority goes on to conclude that the enhancement is also supported because the presentence report stated that methamphetamine was manufactured in the motel room. That fact, however, was vigorously disputed by Williams, and immediately after hearing his objection, the district court appeared to agree with his contention that the motel room was merely a place where chemicals were stored. In explaining its reasons for applying the enhancement, the court referred to the motel room as "not [the] laboratory" but "the place where chemicals were stored." J.A. 43. Although the district court went on to adopt the presentence report, I would hesitate before assuming that every fact in a report is adopted by the district court, no matter how contradictory the court's open court statements.

21

Indeed, no one contends that the district court, after referring to the trailer as located "in a remote area," J.A. 43, adopted the presentence report's erroneous finding that it was located immediately behind Williams's family's house.

If this case hinged on whether or not methamphetamine was manufactured in the motel room, I would prefer to remand to allow the district court to clarify its factual findings. But because I agree with the majority that the enhancement would apply even assuming the district court did not find that methamphetamine was manufactured in the motel room, I concur.